**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LA WUANDIA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-02347 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| METRA POLICE DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff La Wuandia Williams was pulled over by Defendant Officer Eric Gonzalez,[1] a

Metra Police Department ("MPD") officer, on May 19, 2019. After taking Williams's license,

Gonzalez determined—Williams contends wrongfully so—that her license was suspended.

Gonzalez called for a second officer, Defendant Officer Atha Hunt, who arrived at the same time

as a tow truck. Under the impression that her car would be retrieved by family and not towed,

Williams sought clarification. At this point, she alleges, the officers escalated the interaction and

violently placed her under arrest in the back of their vehicle. Her car was indeed towed, but by

the time she located it, she could not afford the fees to release the car from the impound lot.

Williams sued, asserting six counts relating to her arrest and the seizure of her car. Gonzalez and

Hunt have filed motions to dismiss four counts (Dkt. No. 38), and three other MPD officers have

moved to dismiss her unlawful seizure claim against them (Dkt. No. 58). For reasons stated

below, the motions are granted in part and denied in part.

---

[1] Williams's First Amended Complaint does not include first names for any Defendants. However, the briefing contains full names, which the Court uses here.

## BACKGROUND

The following facts are drawn from Williams's First Amended Complaint ("FAC"). At the motion to dismiss stage, the Court construes all well-pleaded facts as true and draws all reasonable inferences in Williams's favor. *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016).

Shortly before merging from northbound I-57 onto the Dan Ryan Expressway ("Dan Ryan") in Chicago, on May 19, 2019, Williams noticed an MPD SUV ("SUV") behind her. (FAC ¶¶ 19–23, Dkt. No. 36.) Williams spoke with her sister on her hands-free speaker phone as she drove. (*Id.* ¶ 21.) The SUV changed lanes when she changed lanes; after Williams and the SUV veered out of their lane to avoid a reckless driver that nearly struck both vehicles, the SUV continued driving behind her. (*Id.* ¶¶ 24–26, 28.) Williams noticed that the SUV did not activate its emergency lights in response to the reckless driver but instead continued behind her; indeed, when she exited the Dan Ryan at the 71st Street exit, the SUV took the same exit. (*Id.* ¶¶ 27–28, 31–32.) Williams, a Black woman, stayed on the phone with her sister because of her concerns fueled by reports of assaults on people of color by police officers. (*Id.* ¶¶ 10, 29–30.)

When Williams crossed the intersection of 71st Street and State Street, the SUV turned on its emergency lights. (*Id.* ¶ 33.) In response, Williams pulled over to the shoulder of the road and the SUV pulled up behind her. (*Id.* ¶¶ 34–35.) Gonzalez, who had been driving the SUV, approached the driver's window, whereupon Williams asked why she had been pulled over. (*Id.* ¶¶ 36–37.) Gonzalez replied that she had failed to use a signal when she took the 71st Street exit. (*Id.* ¶ 38.) When asked why he had been following her since before she merged onto the Dan Ryan, Gonzalez stated that Williams had swerved on I-57 and he followed her to determine whether she was driving under the influence. (*Id.* ¶¶ 39–40.) He asked for her driver's license and insurance. Williams provided her driver's license, but she did not provide proof of insurance

because her insurance card was on her phone and she did not want to terminate the ongoing call with her sister. (*Id.* ¶¶ 41–43.) Gonzalez went back to the SUV for ten minutes with Williams's license and then, upon returning to her car, informed her that her license was suspended. (*Id.* ¶¶ 44–45.) However, he did not state the reason for suspension, return her license, issue any citations, or contact DuPage County to confirm the validity of her license. (*Id.* ¶¶ 46–51.)

Instead, Gonzalez informed Williams that she could no longer operate her vehicle. (*Id.* ¶ 52.) Her sister, still on the phone, asked if she could come and retrieve the vehicle, to which Gonzalez responded that she could so long as she had a valid license. (*Id.* ¶¶ 53–54.) He instructed Williams to wait in the car until her sister arrived. (*Id.* ¶ 55.) Shortly thereafter, Gonzalez approached Williams's window for a third time, informing her that Hunt was on his way from the nearby Metra Blue Island station and that she should remain in the car until he arrived. (*Id.* ¶¶ 58, 61, 63.) Hunt arrived 45 minutes later at the same time as a tow truck. (*Id.* ¶¶ 65–67.) Hunt then approached Williams's driver's side window with Gonzalez and demanded Williams exit the vehicle. (*Id.* ¶¶ 68–71.)

When Williams told Hunt that a tow was unnecessary because her sister was coming to retrieve her vehicle, he accused her of resisting arrest. (*Id.* ¶¶ 75–76.) Williams stated that she would call 911, after which Hunt opened her driver's side door, lunged toward her, and ripped her phone from her hand. (*Id.* ¶¶ 77–78.) At Hunt's direction, Gonzalez opened her passenger side door and began tugging and pushing her from the passenger side. (*Id.* ¶¶ 79–80.) After Hunt grabbed her phone, he began "pulling and twisting her arm and clothing, digging his fingers into her shoulder and arm," such that Williams began to scream. (*Id.* ¶¶ 81–83.) This prompted Hunt to pull her from the car, causing her to fall and nearly hit her head on the ground. (*Id.* ¶ 84.) As she stood, Hunt tore Williams's car keys from her hand, breaking a fingernail. (*Id.* ¶ 85.) Hunt

twisted her arm behind her body, smashed her against her car, handcuffed her, and grabbed her buttocks. (*Id.* ¶¶ 85–91.) He handcuffed her again and dragged her to Gonzalez's SUV. (*Id.* ¶¶ 95-96.)

By that time, Williams's sister and family had arrived. Her sister walked from her car to Williams's car, at which point Hunt told her to stay back lest she also be arrested. (*Id.* ¶¶ 97–99.) While attempting to secure Williams in the SUV, Gonzalez slammed the door on her leg twice. (*Id.* ¶ 101.) Williams was taken to the MPD office in Blue Island, Illinois, where she was searched but not read her *Miranda* rights and not permitted a phone for legal assistance or to inform her family of her location. (*Id.* ¶¶ 104–107.) Eventually, Williams was issued a $2,000 bond and three citations, released without being informed where her car was, and ordered to appear in court on June 26, 2019. (*Id.* ¶¶ 118–120, 122.)

After her release, Williams began searching for her vehicle. (*Id.* ¶ 124.) Defendant Officer Thomas Babusch, who Williams encountered at the MPD office, stated he had no knowledge of her car's location. (*Id.* ¶ 126.) He took her contact information, told her he would follow up, and instructed her to contact Defendant Officer Brian Peters. (*Id.* ¶¶ 129–130.) When Williams contacted Peters, he told her that he was not the proper person to ask about her car and he instructed her to contact Defendant Officer Ronald Davis instead. (*Id.* ¶ 134.) Williams's talks with Davis were fruitless. (*Id.* ¶ 136.) Eventually, nine days after her arrest, a City of Chicago employee informed Williams that her car was located at B&R Towing ("B&R") in Alsip, Illinois. (*Id.* ¶ 137.) While Williams had obtained documentation from the City of Chicago that her license was not, in fact, suspended, B&R declined to release her car without payment unless she had an authorization form from the MPD, which Williams sought unsuccessfully. (*Id.*

¶¶ 132, 138, 140.) It is not clear, however, to whom Williams spoke at the MPD about the authorization form.

When Williams first contacted B&R, the towing and storage fee totaled $700—between $185 and $225 for the tow, and $55 per day for storage. (*Id.* ¶ 139.) Williams could not afford to pay that sum. (*Id.* ¶ 142.) Weeks went by and Williams did not retrieve her car, although she was able to retrieve items from the car on several occasions. (*Id.* ¶¶ 141–146.) In September 2019, B&R sold Williams's car to a third party, who destroyed it. (*Id.* ¶ 153.) B&R purportedly sent Williams a letter on June 9, 2019, stating that if the matter was not addressed within 30 days, the vehicle would be disposed of. But the letter was unsigned and Williams did not receive it. (*Id.* ¶ 150.)

When Williams first spoke to Babusch shortly after her arrest, she also informed him that she intended to file a complaint regarding the circumstances surrounding her arrest. (*Id.* ¶ 127.) Babusch responded that to do so she would have to return to the MPD's office, appear before himself and another investigator, and sign a document stating that if her statement were found to be false, she would be subject to two years' imprisonment and a $250,000 fine. (*Id.* ¶ 128.) Williams eventually delivered her complaint to the MPD's Chief, Joseph Perez, on July 10, 2019. (*Id.* ¶ 154.) Neither Perez nor the MPD ever followed up regarding her complaint. (*Id.*)

Williams was charged with four counts in state court, all of which were stricken from the state court's call in March 2020. (*Id.* ¶¶ 155–156.) She filed her *pro se* complaint in this Court on April 30, 2021. (Dkt. No. 1.) The then-presiding judge recruited counsel for Williams, and that counsel filed the FAC, which alleges six counts. (Dkt. No. 36.) The present motions do not challenge all six counts. No Defendant moves to dismiss Count I, which asserts a claim for use of excessive force under 42 U.S.C. § 1983 against Gonzalez and Hunt. Count III, which alleges a

claim for an unreasonable seizure pursuant to § 1983 against all defendants, is challenged only by Babusch, Peters, and Davis (collectively, "Babusch Defendants"); as a result, Count III will proceed as to Gonzalez and Hunt regardless of the disposition of these motions.[2]

Gonzalez and Hunt ask this Court to dismiss four counts: Count II, which asserts a § 1983 claim for deliberate indifference to Williams's medical needs; Count IV, which alleges a § 1983 claim based on a conspiracy to violate Williams's civil rights; Count V,[3] which asserts a § 1983 claim for violation of the Equal Protection Clause; and Count VI, which asserts a claim for assault and battery under Illinois law. (Defs'. Gonzalez and Hunt Mot. to Dismiss ("Gonzalez Mot."), Dkt. No. 38.) The Babusch Defendants move to dismiss Count III as to them. (Defs'. Babusch, Davis, and Peters Mot. to Dismiss ("Babusch Mot."), Dkt. No. 58.)

## DISCUSSION

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

---

[2] Count III is the only count brought against all Defendants. All other counts are brought against only Gonzalez and Hunt.

[3] Count V is mistakenly styled as Count VI in the FAC, which skips from Count IV to two counts labeled as Count VI. The Court's references to Count V refer to Williams equal protection claim, and its references to Count VI refer to her assault and battery claim. In her response to the Gonzalez Motion, Williams states that she asserts seven, not six, counts in the FAC, but the Court does not see a seventh count.

## I.      Gonzalez Motion

The Court first turns to the Gonzalez Motion, which seeks dismissal of four counts asserted only against Gonzalez and Hunt.

### A.      Count II: Deliberate Indifference to Medical Needs

Count II asserts a claim under § 1983 for the alleged violation of Williams's constitutional rights due to Gonzalez's and Hunt's failure to ensure prompt and adequate medical treatment. (FAC ¶¶ 163–167.) The FAC does not state which constitutional amendment Gonzalez and Hunt allegedly violated. Despite Gonzalez and Hunt's arguments to the contrary, however, Williams need not specifically state which amendment gives rise to her claim; "as long as [the FAC] provided adequate notice to the defendants of [her] claims, it is immaterial whether it mentioned the Fourth or the Eighth Amendment." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017); *see also Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) ("[T]here is no duty to plead legal theories.").

In any case, the Fourth Amendment, which "governs the period of confinement between arrest without a warrant and the probable cause determination," governs the claim here. *Currie*, 728 F.3d at 629 (internal quotation marks and alterations omitted). To state a claim for deliberate indifference in violation of the Fourth Amendment, a plaintiff must plead facts that show the "officer's conduct was objectively unreasonable under the circumstances." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Courts look to four factors to determine objective unreasonableness: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). The "reasonableness analysis operates on a sliding scale,

balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Id.* at 531 (internal quotations marks omitted).

Assuming that she had a medical need, Williams has successfully alleged that Gonzalez and Hunt were on notice of that need. "Beating a person in violation of the Constitution 'impose[s] on the assailant a duty of prompt medical attention to any medical need to which the beating might rise.'" *Smith v. Hunt*, No. 08 C 6982, 2010 WL 3842374, at *10 (N.D. Ill. Sept. 27, 2010) (quoting *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996)). Williams alleges that Gonzalez and Hunt used excessive force against her (a claim the two officers have not moved to dismiss). Assuming the truth of her allegations regarding the beating from which her alleged medical need appears to have derived, Gonzalez's and Hunt's direct involvement imputes notice.

Next are the seriousness of the medical need and the scope of requested treatment. "The severity of the medical condition under [the Fourth Amendment] standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment." *Williams*, 509 F.3d at 403. Williams alleges several incidents that purportedly led to her injury. She alleges that Hunt injured her while ripping her phone from her hand (FAC ¶ 78), that he tore her from the car, forcing her to use her forearm to protect herself from hitting her head on the asphalt (*id.* ¶ 84), that he broke her nail (*id.* ¶ 85), and that he twisted her arm behind her body while slamming her into her car (*id.* ¶¶ 86–87). She further alleges that Gonzalez slammed the SUV door on her leg twice. (*Id.* ¶ 101.)

But Williams fails to adequately allege a medical need. The closest she comes to doing so is when she alleges that Hunt "caus[ed] her bodily injury." (FAC ¶ 78.) Yet Williams does not allege what that injury was or that she incurred a medical need when Hunt twisted her arm or slammed her into the car. She does allege breaking a nail, but a broken nail is not, without more,

a medical need. And while Williams alleges that Gonzalez slammed the SUV door on her leg twice, she does not allege a medical need arising from that incident. *See Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (affirming summary judgment in the defendant officers' favor on a Fourth Amendment deliberate indifference claim because the plaintiff did not "offer[] proof that his appearance portended heat stroke or implied a need for medical attention"). While Williams need not offer proof at the motion to dismiss stage, she has not alleged that her injuries indicated anything other than discomfort during her arrest. For example, she has not alleged that her leg swelled or appeared broken, that her forearm appeared to require medical attention, or that her shoulder was injured from being twisted behind her back. Likewise, Williams does not allege that she requested, or even required, medical attention of any sort. *See Lawrence v. Lewandowski*, 2009 WL 2950611, at *7 (E.D. Wis. Sept. 9, 2009) (finding that a Fourth Amendment deliberate indifference claim to survive a motion to dismiss where the plaintiff alleged that "[h]e repeatedly requested medical attention, but his requests were met with insults" (internal quotation marks omitted)). *Compare Annan v. Zaborowski*, No. 12 C 3577, 2013 WL 3771248, at *2 (N.D. Ill. July 16, 2013) ("Nowhere in [the plaintiff's] complaint does he allege that he required medical treatment when the Officers arrested him. Nor does he describe any physical injuries he suffered as a result of [an officer's] alleged conduct in frisking him.") *with Florek v. Vill. of Mundelein*, No. 05 C 6402, 2010 WL 1335526, at *9 (N.D. Ill. Mar. 31, 2010) (finding a medical need for purposes of a Fourth Amendment claim where a plaintiff requested aspirin and an ambulance).

While Gonzalez and Hunt would be on notice if there were a medical need, Williams has failed to adequately allege either a medical need or that she requested treatment. For these reasons, Count II is dismissed.

### B. Count IV: Conspiracy

In Count IV, Williams alleges that Gonzalez and Hill conspired to violate Williams's constitutional rights. To state a § 1983 conspiracy claim, a plaintiff must allege: "(1) Defendants reached an agreement to deprive Plaintiff of [her] constitutional rights; and (2) an overt act in furtherance of the conspiracy that actually deprived Plaintiff of those rights." *Sopron v. Cassidy*, No. 19-cv-08254, 2022 WL 971563, at *7 (N.D. Ill. Mar. 31, 2022) (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (describing requirements to survive summary judgment on a § 1983 conspiracy claim)). "It is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Hill v. Cook County*, 463 F. Supp. 3d 820, 840 (N.D. Ill. 2020) (quoting *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)).

Williams has met this burden by alleging the "who, what, and when." *Hill*, 463 F. Supp. 3d at 840. She has alleged that Gonzalez and Hunt conspired violently to arrest her, thereby depriving her of her constitutional rights, on May 19, 2019. As additional detail, Williams alleges that Hunt "commanded" Gonzalez to get her, after which Gonzalez opened her passenger door and began attacking her from that side of the car. (FAC ¶¶ 79–80.) She has also alleged a situation that was relatively under control until Hunt arrived, at which point her car was unlawfully seized and she was unconstitutionally beaten by the officers. While "conspiracies are often carried out clandestinely," *Beaman*, 776 F.3d at 511, there is no requirement that the agreement be reached behind closed doors.

Despite Gonzalez's and Hunt's suggestions to the contrary, Williams need not set out all the specifics of the alleged conspiracy to survive a motion to dismiss. "Under *Twombly*, all plaintiff need[s] to allege [is] a plausible account of a conspiracy." *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012). Drawing all reasonable inferences in Williams's favor, the

FAC sufficiently alleges that Gonzalez and Hunt conspired with one another to violate her constitutional rights. Williams's claims do not rely on a shadowy connection between two unrelated actors but instead rest on an alleged agreement to violate her constitutional rights that was reached directly in front of her. In sum, Williams has adequately set out the who, what, and when of the alleged conspiracy. At the motion to dismiss stage, no more is needed. Gonzalez and Hunt's motion to dismiss Count IV is therefore denied.

### C.    Count V: Equal Protection

In Count V, Williams alleges that Gonzalez and Hunt violated her rights under the Equal Protection Clause of the Fourteenth Amendment by engaging in misconduct motivated by race and gender animus. "The Equal Protection Clause of the Fourteenth Amendment prohibits state action that discriminates on the basis of membership in a protected class or irrationally targets an individual for discriminatory treatment as a so-called 'class of one.'" *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Williams is unclear which theory she invokes, so the Court considers both.

First, Williams has not adequately alleged sex-based discrimination or developed any argument regarding sex-based discrimination. Although Williams nominally alleges violations of her equal protection rights based on both race and sex, the FAC is devoid of any allegations regarding sex-based discrimination, outside of a conclusory allegation that "[t]he misconduct described . . . was motivated by race and gender animus." (FAC ¶ 181.) Indeed, her opposition to Gonzalez and Hunt's motion centers on an argument that she was pulled over for "driving while black," (Williams Opp'n to Gonzalez Mot. ("William Opp'n I) at 8, Dkt. No. 52), and elides any mention of sex. As such, she has not stated a claim for a sex-based violation of her equal protection rights.

With respect to Williams's claim of race-based discrimination, "[r]acially selective law enforcement is a quintessential equal protection violation." *Conley v. United States*, 5 F.4th 781, 788 (7th Cir. 2021); *see also King v. City of Chicago*, No 22 C 4605, 2023 WL 4473017, at *3 (N.D. Ill July 11, 2023) ("A plaintiff can prove a state has imposed a racial classification by identifying either (1) a law that draws facial classifications based on race or (2) a law that, while facially neutral, was either racially motivated or racially administered."). To state a claim that a law is racially administered, a plaintiff must allege that "the state action 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *King*, 2023 WL 4473017, at *3 (quoting *Johnson v. California*, 543 U.S. 499, 506–07 (2005)). "Discriminatory purpose means more than simple knowledge that a particular outcome is the likely consequence of an action; rather, discriminatory purpose requires a defendant to have selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (internal quotation marks and alterations omitted).

Williams fails to allege a discriminatory purpose. While she alleges that she was nervous upon noticing the SUV following her because of "negative reports of questionable behavior and violent assaults on people of color by police officers" (FAC ¶ 29), she does not go further to state that her stop was racially motivated. A generalized allegation that police have on occasion engaged in violence towards people of color is not sufficient to state a claim here, given that Williams does not allege that Gonzalez and Hunt were motivated to engage in any actions they took because of her race. *See King*, 2023 WL 4473017, at *4 ("[T]o establish a discriminatory purpose, a plaintiff must demonstrate that the decisionmaker was motivated by race.").

In her brief, Williams relies on a line of cases allowing equal protection claims to proceed based on a driving-while-Black theory. But she never actually alleges that race contributed in

any way to what happened to her. Only two allegations in the FAC implicate race: that Williams became nervous when she saw the SUV behind her due to "numerous negative reports of questionable behavior and violent assaults on people of color by police officers" (FAC ¶ 29), and the conclusory allegation in Count IV that "[t]he misconduct described in this count was motivated by race and gender animus and constituted purposeful discrimination" (*id.* ¶ 182). The cases upon which Williams relies, in contrast, either expressly alleged that the plaintiff was singled out for "driving while Black" or expressly invoked the existence of the practice. *See United States v. Johnson*, 874 F.3d 571, 575 (2017) (*en banc*) (Hamilton, J., dissenting) (discussing how the majority "enabl[ed] seizures that can be used for 'parking while black'"); *Fells v. County of DuPage*, No. 06C2519, 2006 WL 3692414, at *1 (N.D. Ill. Dec. 12, 2006) ("Plaintiff alleges that the only law he broke was 'driving while black' in a mostly white area."); *Martinez v. Vill. of Mount Prospect*, 92 F. Supp. 2d 780, 781 (N.D. Ill. 2000) (approving a settlement agreement in a case where officers were permitted "to testify that they were instructed by commanding officers to target Hispanic drivers for traffic stops").

A "class of one" claim, in contrast, "asserts that an individual has been 'irrationally singled out,' without regard for any group affiliation, for discriminatory treatment." *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)). To state a claim under this theory, a plaintiff must allege "(1) that Defendants treated [her] differently from others who are similarly situated and (2) that there is no rational basis for the different treatment or that [she] was treated differently because of the Defendants' 'totally illegitimate animus' toward [her]." *Muczynski v. Lieblick*, 769 F. Supp. 2d 1129, 1132 (N.D. Ill. 2011) (quoting *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

To the extent Williams seeks to assert a class-of-one claim against Gonzalez and Hunt, she fails at the first element. Nowhere in the FAC does she allege that she was treated "differently from others who are similarly situated." *McDonald*, 371 F.3d at 1001. While the Seventh Circuit has questioned whether a similarly situated person must be identified in the complaint, *Geinosky*, 675 F.3d at 748 n.3, Williams does not so much as allege the potential existence of a similarly situated person. In her brief, Williams argues that dismissal is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." (Williams Opp'n I at 9 (quoting *Hunt v. Jaglowski*, 665 F. Supp. 681, 683–84 (N.D. Ill. 1987) (internal quotation marks omitted).). But "no set of facts" is no longer the pleading standard. *Twombly*, 550 U.S. at 563 ("[A]fter puzzling the profession for 50 years, [the "no set of facts" language] has earned its retirement.").

Williams raises one other argument in support of her equal protection claim: that she attempted to obtain MPD records on its officers' history (or lack thereof) of racial profiling but her request was rejected by Metra's Freedom of Information Act ("FOIA") Department as overly burdensome. Notably, Williams does not and cannot say what a response to her request would have revealed. But more importantly, "[a]s a general rule, on a 12(b)(6) motion, the court may consider only the plaintiff's complaint." *Rosenblum v. Travelbybus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). A court may consider material outside the complaint's four corners only in limited circumstances, such as "documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [her] claim." *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (internal quotation marks omitted). Williams's failed FOIA request does not open the door to consideration of facts beyond what she has pleaded, nor does it support an inference of racial discrimination.

For these reasons, Count V is dismissed.

### D.     Count VI: Assault and Battery

Finally, Gonzalez and Hunt move to dismiss Williams's claim for assault and battery under Illinois law, arguing that the claim is barred by the applicable statute of limitations. The parties agree that the limitations period for personal injury claims against a MPD officer is one year. 70 ILCS 3615/5.03. Williams also acknowledges that she did not file suit within one year of her arrest. Nonetheless, she argues that the Court should apply the doctrine of equitable tolling to allow her claim.

In general, "[a] complaint need not anticipate affirmative defenses like the statute of limitations and will not be dismissed just because it does not confirm its own timeliness." *Milchtein v. Milwaukee County*, 42 F.4th 814, 822 (7th Cir. 2022). But "the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (internal quotation marks omitted). Here, William's complaint does just that. She alleges that the events giving rise to her assault and battery claim occurred on May 19, 2019, and that the defendants were MPD officers. Illinois law establishes a one-year statute of limitations for personal injury lawsuits against a government entity such as Metra, a statute of limitations that Williams agrees controls this claim. 70 ILCS 3615/5.03; *see also Hudson v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 17 C 5426, 2019 WL 4261581, at *5 (N.D. Ill. Sept. 9, 2019) ("Although Illinois generally applies a two-year statute of limitations to personal injury claims . . . a personal injury suit against a government entity like Metra must be brought within one year."). Yet Williams filed this suit on April 30, 2021, just over eleven months after the expiration of the one-year period.

Despite this, Williams argues that her claim is saved by the doctrine of equitable tolling. "A litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (internal quotation marks omitted). The second element "is met only where the circumstances that caused a litigant's delay are both extraordinary **and** beyond [her] control." *Id.* at 257. Equitable tolling is an "extraordinary remedy . . . rarely granted." *Ademiju v. United States*, 999 F.3d 474, 477 (7th Cir. 2021) (internal quotation marks omitted). The party invoking equitable tolling bears the burden of establishing both elements. *Madison v. U.S. Dep't of Lab.*, 924 F.3d 941, 947 (7th Cir. 2019).

Williams contends that she diligently pursued her rights throughout the year-long period in two ways: ***first***, by informing Babusch that she intended to file a complaint with the MPD, which she ultimately did two months later, and second, by unsuccessfully seeking counsel to file a civil case. However, Williams also notes that defending the ongoing traffic case diverted her resources from filing a civil suit. (Williams Opp'n I at 4.) Juggling a state court traffic case and a potential federal civil rights lawsuit is not an easy task. But that difficulty does not warrant equitable tolling, and even where a plaintiff is continually researching a potential claim during the limitations period, that "is not enough to establish reasonable diligence." *United States v. Hayes*, No. 19 C 50104, 2020 WL 2112367, at *3 (N.D. Ill. May 4, 2020).

Williams also contends that during her search for counsel, several attorneys informed her that the statute of limitations for her claims was two years, not one. But while some courts have found that fairness requires application of equitable tolling where "a *pro se* claimant 'was diligently pursuing his rights, and relied on incorrect information given to him by a court

16

employee,'" *James v. Berryhill*, No. 17 C 5252, 2017 WL 5128984, at *2 (N.D. Ill. Nov. 6, 2017) (quoting *Purchase v. Colvin*, No. 15-CV-1075-JPG-CJP, 2016 WL 6963301, at *2 (S.D. Ill. Nov. 29, 2016)), when it comes to advice from attorneys, "incorrect legal advice generally does not by itself trigger equitable tolling." *Ademiju*, 999 F.3d at 477; *see also Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006) ("Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling.").

Finally, Williams argues that restrictions imposed during the COVID-19 pandemic, which began in earnest in March 2020, prevented timely filing. Williams urges the Court to consider this an extraordinary circumstance that warrants equitable tolling. Williams cites two cases in which courts within the Seventh Circuit considered equitable tolling due to issues arising from COVID-19 orders. However, in the first, the district court applied equitable tolling where a plaintiff took tangible steps towards filing suit: he tried to file online but was unable to pay, tried to file in person at the Daley Center courthouse but the courthouse was closed, repeatedly tried to communicate with the clerk's office without success, visited the courthouse several more times and found it closed, and returned to file his lawsuit on the day that a security guard had told him the courthouse reopen. *See Day v. Niles Twp. High Sch. Dist. 219 Bd. of Educ.*, No. 20 C 5772, 2020 WL 7641273, at *1–2 (N.D. Ill. Dec. 23, 2020). In the other case, the district court found that equitable tolling ***did not*** apply to an inmate's habeas petition where a prison restricted access to legal materials starting in March 2020 because the inmate was aware of his claim and had all information necessary to pursue it before lockdowns were put in place. *See Turner v. United States*, No. 16-cr-40044-1-JES, 2021 WL 796135, at *2–3 (C.D. Ill. Mar. 2, 2021).

Williams's efforts to initiate this lawsuit do not resemble those found to support equitable tolling in *Day*. While she references a Cook County court website stating that certain help desk services were not being offered in person, she did not file her suit in Cook County's court system and she does not mention the Northern District of Illinois's resources for *pro se* litigants. Nor does Williams provide any reason to conclude that her circumstances were different than those of any other *pro se* litigant during the height of the COVID-19 pandemic. Indeed, the implication from Williams's argument is that she chose to put her civil claims on the back burner to focus instead on her traffic case.

In short, Williams has not shown that she diligently pursued her rights or that there were extraordinary circumstances warranting equitable tolling. As she acknowledges that she filed suit after the expiration of the limitations period, Williams's claim for assault and battery is therefore untimely. Count VI is dismissed with prejudice.

## II.    Babusch Motion

Babusch Defendants have filed their own motion to dismiss the claim in Count III based on an unreasonable seizure. This count relates to Williams's claim that she was not informed of her vehicle's location for nine days after her arrest, which unreasonably prolonged her vehicle's seizure. (FAC ¶ 170.) In seeking dismissal, Babusch Defendants argue that Williams fails to allege that any of the three took an intentional action or that any of the three were personally involved in the deprivation of her property.

The Fourth Amendment governs claims for unreasonable seizure of property. *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). To state a claim for a constitutional violation under § 1983, a plaintiff must allege facts sufficient "to support a plausible inference 'that the defendants were personally responsible for the deprivation of [her] rights.'" *Bishop v. White*, No. 16 C 6040, 2019 WL 5550576, at *3 (N.D. Ill. Oct. 28, 2019) (quoting *Wilson v. Warren County*,

830 F.3d 464, 469 (7th Cir. 2016)). "[M]ore than mere negligence" is required; "[a] defendant is personally responsible if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent." *Wilson*, 830 F.3d at 469 (internal quotation marks omitted).

The only alleged actions by Babusch Defendants relate to Williams's navigation of the MPD bureaucracy. The closest she comes to alleging intent or personal involvement in an unlawful seizure by Babusch Defendants is her allegation that Babusch failed to call her back as promised. (FAC ¶¶ 129, 131.) At best, combined with his warning of the punishment for filing a false complaint (*id.* ¶ 128), there may be a plausible inference of intent to prolong the time for Williams to locate and pay to retrieve her car. But Williams never alleges that Babusch knew where her car was, failed to attempt to locate her car, or otherwise intentionally prolonged the time her car was impounded. The same is true for Peters and Davis—all Williams alleges is generalized bureaucratic incompetence and disinterested public servants. If true, such conduct would be troubling but would not rise to the level of a constitutional violation.

Furthermore, even if her car were unlawfully seized on May 19, 2019, "continued retention of the unlawfully seized property is not a separate Fourth Amendment wrong." *Gonzalez v. Vill. of West Milwaukee*, 671 F.3d 649, 660 (7th Cir. 2012); *see also Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003) ("[Plaintiff's] car was seized when it was impounded. The car's subsequent search was completed after ten days. Conditioning the car's release upon payment of towing and storage fees after the search was completed neither continued the initial seizure nor began another."). The Seventh Circuit does not recognize a Fourth Amendment violation in the prolonged retention of seized property. If there was an

unreasonable seizure, it took place on May 19, 2019, when Williams's vehicle was towed. And Williams does not allege any actions by Babusch Defendants on that day.

Williams's analogy to *Rodriguez v. United States*, 575 U.S. 348 (2015), is inapt. The *Rodriguez* court considered the seizure of a person, not property. *See West v. Kusch*, No. 21 CV 6710, 2022 WL 2105936, at *2 (N.D. Ill. June 10, 2022) (finding citation to cases analyzing seizure of property inapt in a seizure of the person setting). Furthermore, as noted above, the seizure at issue here occurred when Williams's car was towed and the Seventh Circuit does not recognize a separate wrong in prolonging seizure of property. In *Rodriguez*, by contrast, the act of prolonging a traffic stop transformed a once-lawful stop into an unlawful seizure. *See* 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'"). Williams provides no reason for this Court to analyze a seizure of property as though it were the seizure of a person.

Therefore, Williams's claims against Babusch, Davis, and Peters in Count III fail on their merits. For that reason, the Court need not consider the statute of limitations defense raised in the Babusch Motion.

## CONCLUSION

For the foregoing reasons, Gonzalez and Hunt's motion to dismiss (Dkt. No. 38) is granted in part and denied in part. The motion is granted as to Counts II, V, and VI, and denied as to Count IV. Babusch, Peters, and Davis's motion to dismiss (Dkt. No. 58) is granted. Count III is dismissed as to Defendants Babusch, Peters, and Davis.

ENTERED:

Dated:  April 29, 2025

_____
Andrea R. Wood
United States District Judge